IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>KEVIN MARSH | CR. NO.:  3:20-727<br><br>18 U.S.C. § 371<br>18 U.S.C. § 1341<br>18 U.S.C. § 1343<br>18 U.S.C. § 981<br>18 U.S.C. § 982<br>28 U.S.C. § 2461<br><br>INFORMATION |

THE UNITED STATES ATTORNEY CHARGES:

At all times relevant to this Information:

1.  The defendant, KEVIN MARSH, along with others known and unknown to the United States Attorney, consisting of former SCANA Corporation ("SCANA") executives, employees, and the lawyers who advised them, led a failed effort to construct two nuclear power generators in Fairfield County, South Carolina. As construction problems mounted, costs rose, and schedules slipped, the defendant, KEVIN MARSH, and others, hid the true state of the project. Through intentional and material misrepresentations and omissions, the defendant, KEVIN MARSH, deceived regulators and customers in order to maintain financing for the project and to financially benefit SCANA. The members of the conspiracy's actions and the associated cover-up resulted in billions of dollars of loss.

## Background

2. SCANA was a publicly-traded holding company engaged, through subsidiaries, in electric and natural gas utility operations and other energy-related businesses. SCANA was incorporated in South Carolina and maintained its principal executive offices at 220 Operation Way, Cayce, South Carolina 29033-3701.

3. SCANA's principal subsidiary, South Carolina Electric and Gas Company ("SCE&G"), was a regulated public utility engaged in the generation, transmission, distribution and sale of electricity, primarily in South Carolina. SCE&G, a monopoly, had approximately 700,000 electricity customers and 350,000 natural gas customers in South Carolina (hereinafter, SCANA and SCE&G will be referred to collectively as "SCANA").

4. The Public Service Commission ("PSC") was a board comprised of seven elected persons charged by the State of South Carolina with regulating utility rates. The PSC performs the adjudicative function of utility regulation.

5. The Office of Regulatory Staff ("ORS") was created by Act 175 in 2004. The ORS was responsible for the inspection, auditing, and examination of public utilities. The ORS had a dual function: (1) it represented South Carolina's public interest in utility regulation before the PSC, the court system, the South Carolina General Assembly, and federal regulatory bodies; and (2) it advanced the utilities' interests. In fulfilling these dual roles, ORS performed the investigative, legal, prosecutorial, and educational roles of utility regulation, while at the same time acting as an advocate for the utilities.

6. As a regulated monopoly, SCANA was required to truthfully and fully cooperate with the ORS and the PSC.

7. Beginning in November 2011, the defendant, KEVIN MARSH, was SCANA's Chief Executive Officer ("CEO") and Chairman of the Board of Directors.

8. Westinghouse Electric Company ("Westinghouse") was a Pennsylvania-based company that was traditionally an engineering firm. Westinghouse designed the AP-1000, a next-generation, modular-based nuclear power plant.

9. Toshiba Corp. ("Toshiba") was a Japanese multinational conglomerate company and majority owner of Westinghouse.

10. The Consortium was the group of companies operating under an Engineering, Procurement, and Construction ("EPC") contract signed by the owners. It included Westinghouse and its construction partner Stone & Webster, ownership of which passed from the Shaw Group ("Shaw") to Chicago Bridge and Iron ("CB&I"), before Westinghouse itself acquired Stone & Webster in late 2015. Stone & Webster was thereafter known as WECTEC.

11. Fluor Corporation ("Fluor") was an engineering, procurement, construction, and project management company headquartered in Irving, Texas.

12. The South Carolina Public Service Authority ("Santee Cooper") was a state-owned utility that provided power and water to citizens of the South Carolina Lowcountry and to approximately twenty cooperative power companies.

13. The Bechtel Corporation ("Bechtel") was an engineering, procurement, construction, and project management company headquartered in Reston, Virginia.

## The Nuclear Project

14. In May 2008, SCANA and Santee Cooper agreed to construct two AP-1000 nuclear reactors ("the Nuclear Project") at the V.C. Summer site in Jenkinsville, South Carolina.

15. Under the agreement, SCANA held the majority ownership interest of 55%, while Santee Cooper held the remaining 45% ownership interest. SCANA and Santee Cooper's arrangement allowed SCANA to effectively control the daily oversight of the Nuclear Project.

16. SCANA did not have the capital to directly finance the cost of the Nuclear Project, initially estimated at $9.8 billion. Instead, SCANA depended on financial incentives provided under the Energy Policy Act of 2005 ("Energy Policy Act"), 42 U.S.C. § 15801, et seq., and the Base Load Review Act ("BLRA"), S.C. Code Ann. §§ 58-33-210, et seq., to finance the Nuclear Project.

17. The Energy Policy Act provided SCANA with tax incentives for constructing the two new nuclear facilities. Under the statutory requirements existing at the time, if SCANA completed the Nuclear Project by January 1, 2021, SCANA would qualify for tax credits valued at approximately $2.2 billion that could be passed along to customers in the form of lower rates.

18. Passed by the South Carolina General Assembly in 2007, the BLRA permitted utility companies to petition the PSC to raise utility rates to cover the construction financing costs during the project rather than wait for project completion to incorporate these costs into the utility's rate base. However, to cover the construction financing costs under the BLRA, SCANA was required to demonstrate that its actions were "prudent." S.C. Code Ann. §§ 58-33-210 et seq. SCANA was required to present the anticipated construction schedule and capital costs to justify the proposed rate increases.

19. In May 2008, SCANA and Santee Cooper signed the EPC contract with the Consortium of Westinghouse and its construction partner Stone & Webster, which was owned at the time by Shaw.[1]

---

[1] On July 30, 2012, CB&I purchased Shaw.

4

20.  On May 30, 2008, SCANA submitted its first application to the PSC under the BLRA requesting rate increases to cover the construction financing costs of the Nuclear Project. In February 2009, the PSC approved SCANA's petition. In July 2009, SCANA submitted a revised construction schedule to the PSC, which the PSC approved in January 2010. During the course of the approval process, SCANA executives vowed to be transparent in the updates they provided to the PSC.

21.  In March 2012, the United States Nuclear Regulatory Commission ("NRC") approved SCANA and Santee Cooper's request to commence nuclear-related construction at the Nuclear Project. Construction began in March 2013. SCANA initially projected that Unit 2 would be generating power by April 2016, and that Unit 3 would be generating power by January 2019.

22.  From its inception, the Nuclear Project was plagued by schedule delays and cost increases. By September 2013, emails among SCANA, Santee Cooper and the Consortium stated that Westinghouse's "missed deadlines put potentially unrecoverable stress on the milestone schedule" approved by the PSC. Within six months, by May 2014, SCANA and Santee Cooper executives sent a letter to Westinghouse and CB&I executives outlining their complaints and criticizing the Consortium for poor performance and recurring design and schedule delays. According to SCANA and Santee Cooper executives, the Consortium had "made promise after promise, but fulfilled few of them."

23.  In October 2015, SCANA and Santee Cooper signed an amendment to the EPC contract with Westinghouse. Also at this time, Westinghouse signed an agreement to acquire CB&I's nuclear subsidiary Stone & Webster and agreed to bring in Fluor as the subcontractor on the Nuclear Project.

24. At various times, SCANA received new projected completion dates for the Nuclear Project from Westinghouse and presented the dates to the PSC for approval as required by the BLRA. The following schedule identifies each request and the dates approved for each reactor:

| Docket 2009-293-E | Unit 2 | April 1, 2016 | Unit 3 | January 1, 2019 |
| Docket 2012-203-E | Unit 2 | March 15, 2017 | Unit 3 | May 15, 2018 |
| Docket 2015-103-E | Unit 2 | June 19, 2019 | Unit 3 | June 16, 2020 |
| Docket 2016-223-E | Unit 2 | August 31, 2019 | Unit 3 | August 31, 2020 |

25. The construction complete percentages provided to SCANA showed that the Nuclear Project was woefully behind schedule, averaging less than 0.6 percent complete per month for over four years.

### The Scheme to Defraud Customers

26. From a time no later than late 2016, and continuing until January 1, 2018, the defendant, KEVIN MARSH, and others, through SCANA, engaged in a scheme, plan, and artifice to defraud customers, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, by making false and misleading statements, and omitting facts necessary to make the statements truthful and not misleading.

27. The defendant, KEVIN MARSH, and members of the conspiracy, though not all conspirators acted at every stage nor participated in the full range of activities of the conspiracy, did through SCANA, make materially false and misleading statements and did omit material information in an effort to continue the Nuclear Project, minimize regulatory risk, and avoid legislative oversight through statements to the PSC, the ORS, the South Carolina State Government, the media, and to SCANA's customers. To further the scheme, various members of the conspiracy at various times and places:

   (A) Represented to regulatory agencies that V.C. Summer Unit 2 would be operational in 2019 and would qualify for the PTCs; when in truth members of the conspiracy knew that the schedule was unrealistic and that Unit 2 would not be completed in 2019.

   (B) Represented to regulatory agencies that V.C. Summer Unit 3 would be operational in 2020 and would qualify for the PTCs; when in truth members of the conspiracy knew that the schedule was unrealistic and that Unit 3 would not be completed in 2020.

   (C) Represented to regulatory agencies that V.C. Summer Units 2 and 3 would be operational in 2019 and 2020, when in truth members of the conspiracy had hired

7

Bechtel to evaluate the project; Bechtel found the Nuclear Project to be significantly off-schedule and over-budget. Members of the conspiracy never provided this information to the regulatory agencies.

(D) Represented to regulatory agencies costs of the project that were significantly and materially lower than what was expected.

(E) Applied for and received rate increases based upon misrepresentations and misleading statements that lead to fraudulently inflated bills to customers for the stated purpose of financing the project.

(F) Sent inflated bills to customers, both electronically and in the mail.

(G) Received payments from customers of inflated rates, both electronically and in the mail.

(H) Provided customers misleading information regarding the progress of the construction of V.C. Summer Units 2 and 3.

(I) Paid over $500 million of the $2.2 billion dollars customers paid to finance the construction project directly to shareholders in dividends.

(J) Provided misleading information to the South Carolina General Assembly regarding the progress of the Nuclear Project.

(K) Commissioned Bechtel to conduct a comprehensive review of the status of the Nuclear Project in 2015, and when Bechtel provided data demonstrating that the Nuclear Project was failing bifurcated, edited, and buried the Bechtel report(s) and the information contained within under disingenuous representations of attorney-client privilege. The Bechtel conclusions were not made public until after abandonment of the Nuclear Project.

## COUNT ONE

28. From a time beginning no later than late 2016, and continuing until January 1, 2018, in the District of South Carolina and elsewhere, the defendant, KEVIN MARSH, and others, through SCANA, knowingly and intentionally combined, conspired, confederated, agreed, and had a tacit understanding to:

   a. knowingly devise a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses, representations, and promises, and in furtherance of this scheme, did use and cause to be used the United States mail and common carriers, in violation of Title 18, United States Code, Section 1341; and

   b. knowingly devised a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses, representations, and promises, transmitted or caused to be transmitted by means of wire, radio, or television communication in interstate commerce, any writings, signs, signals, pictures or sounds for the purpose of executing the scheme and artifice, in violation of Title 18, United States Code, Section 1343.

### The Object of the Conspiracy

29. The object of the conspiracy was for the defendant, KEVIN MARSH, and others, through SCANA, to provide false representations and omit necessary facts in disclosures to the PSC, the ORS, the South Carolina State Government, the media, and to SCANA's customers, so that the construction of the Nuclear Project would continue, minimizing regulatory risk, and avoiding legislative oversight, all to defraud customers through inflated bills.

## OVERT ACT

30. In furtherance of the conspiracy, the defendant, KEVIN MARSH, committed the following overt act in the District of South Carolina, in that on or about December 27, 2016, Toshiba issued a press release announcing a potential multi-billion dollar write-down related to Westinghouse's nuclear construction business. The same day, the defendant, KEVIN MARSH, and others received a confidential telephone briefing from senior Westinghouse officials, during which those officials indicated the costs to complete the new units would be significantly higher than expected.

Also on or about December 27, 2016, the defendant, KEVIN MARSH, received a separate briefing from a senior Toshiba official indicating that Toshiba could not absorb the financial hit suggested by new estimates from Westinghouse's subcontractor for the work remaining on the project. These briefings led the defendant, KEVIN MARSH, to believe that there existed a heightened risk of further construction delays.

When, on December 29, 2016, the ORS requested detailed information from SCANA regarding the construction schedule for both units, the defendant, KEVIN MARSH, along with his coconspirators, withheld the information provided by the officials from Westinghouse and Toshiba.

All in violation of Title 18, United States Code, Section 371.

## FORFEITURE

SPECIFIED UNLAWFUL ACTIVITIES:

Upon conviction of violating Title 18, United States Code, Section 371, as charged in the Information, the defendant, KEVIN MARSH, shall forfeit to the United States, pursuant to Title 18, United States Code, Sections 981(a)(1)(C), 982(a)(2) and 982(a)(1) and Title 28, United States Code, Section 2461(c), any property, real or personal, which is involved in such violation or which constitutes or is derived from proceeds traceable to such property.

The property subject to forfeiture includes, but is not limited to, the following:

(1) Proceeds/Money Judgment:

    (a) A sum of money equal to five million dollars the defendant, KEVIN MARSH, obtained, directly or indirectly, from the offenses charged in Count 1 of the Information.

If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendant, KEVIN MARSH -

    A.    Cannot be located upon the exercise of due diligence;

    B.    Has been transferred or sold to, or deposited with, a third person;

    C.    Has been placed beyond the jurisdiction of the court;

    D.    Has been substantially diminished in value; or

    E.    Has been commingled with other property which cannot be subdivided without difficulty;

it is the intention of the United States, pursuant to Title 18, United States Code, Section 982(b)(1), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant, KEVIN MARSH, up to the value of the forfeitable property;

Pursuant to Title 18, United States Code, Sections 981(a)(1)(C), 982(a)(1) and (a)(2), and Title 28, United States Code, Section 2461(c).

_____
PETER M. MCCOY, JR. (JHM, BBA, EEL, WDHjr)
UNITED STATES ATTORNEY